UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

IRA VORUS,

                Plaintiff,

v.

CORIZON HEALTH CARE et al.,

                Defendants.

_____/

Case No. 2:22-cv-128

Honorable Robert J. Jonker

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff previously sought and was granted leave to proceed *in forma pauperis*. (ECF No. 4.) Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendant Corizon. Plaintiff's First Amendment retaliation claim against Defendant Lewis, as well as his Eighth Amendment claims against Defendants Lewis, Monville, and Jeffery, remain in the case.

<u>**Discussion**</u>

I.      **Factual Allegations**

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Baraga Correctional Facility (AMF) in Baraga, Baraga County, Michigan. The events about which he complains occurred at that facility. Plaintiff sues Health Unit Manager Aaron Jeffery, Health Unit Supervisory Jamie Monville, Nurse Practitioner Unknown Lewis, and Corizon Health Care, the contracted medical provider for the MDOC.

Plaintiff alleges that another wave of COVID-19 struck AMF in November of 2021, causing the facility to return to "outbreak" status. (ECF No. 1, PageID.3.) Plaintiff recalled the "physical ailments that he suffered from contracting the virus during the first outbreak in 2020" and asked administrative and medical staff to "adhere to the protocols mandated by the state by seeing to it that he was properly sep[a]rated and quarantined from the COVID-positive population." (*Id.*) During one of Plaintiff's conversations with medial staff, an unknown nurse told him that while they had authority to order a transfer to another facility, the medical supervisor would have to approve the transfer. (*Id.*)

Plaintiff sent numerous kites to Defendants Monville and Jeffery "concerning the matter of his well-being and health being placed in danger due to staff housing him in a unit where they also quarantined COVID-positive prisoners" when he had not contracted the virus. (*Id.*) Plaintiff asked Defendants Monville and Jeffery to follow COVID-19 protocol and approve an emergency transfer for him. (*Id.*) They responded that medical staff were not transferring prisoners "due to the pandemic and if he w[as] feeling any symptoms of the virus to notify staff and to continue practicing social distancing." (*Id.*)

Plaintiff was "appalled" by this response and contacted his family to ask them to obtain Corizon's contact information and provide it to him, as well as to contact Corizon themselves. (*Id.*)

2

Shortly thereafter, Plaintiff tested positive for COVID-19 in the first week of December 2021. (*Id.*) Plaintiff sent a letter to Corizon, informing the company that administrative and medical personnel at AMF were disregarding COVID-19 protocols because, "instead of practicing social distancing and the quarantining of positive inmates, [they] were practicing social compil[]ing and commingling of COVID-positive and negative prisoners contributing to the mass spreading of the virus." (*Id.*, PageID.4.) Plaintiff also noted that medical personnel had refused to transfer him to a safer facility. (*Id.*)

On December 8, 2021, Plaintiff saw Defendant Lewis for an examination. (*Id.*) Defendant Lewis told Plaintiff that he was experiencing a rare reaction to the COVID-19 virus that caused his "white blood cells to decrease excessively to the point of not having any." (*Id.*) She diagnosed Plaintiff with neutropenia and recommended that he be transferred to a designated COVID-19 cohort medical facility. (*Id.*) Plaintiff "fell extremely ill and suffered the maladies of fatigue, shortage of breath, severe headaches, extreme vomit[]ing, and loss of taste and smell." (*Id.*) Plaintiff, however, was never transferred to a cohort facility. (*Id.*) Moreover, he did not receive medical treatment "even after being diagnosed with suffering a rare ailment." (*Id.*)

On December 15, 2021, Plaintiff filed a Step 1 grievance regarding the inadequate medical treatment provided by Defendants Lewis and Corizon. (*Id.*) Plaintiff also filed a grievance against Defendants Monville and Jeffery, as well as administrative personnel, for failing to separate and quarantine COVID-positive prisoners. (*Id.*)

In late December 2021, Defendant Lewis approached Plaintiff's cell and stated, "Mr. Vorus, I was contacted about that grievance you filed [] concerning your treatment. I guess you thought that would turn out in your favor, but that wasn't pretty smart." (*Id.*, PageID.5.) Plaintiff responded that he was doing whatever he could to secure his health and receive treatment. (*Id.*)

Plaintiff complained that Defendant Lewis and medical staff were "dragging [their] feet" regarding his recommended transfer. (*Id.*)

Defendant Lewis told Plaintiff that he was not the only prisoner "in this position that we have to deal with." (*Id.*) She also stated that he was getting "pushed to the back burner" because of the grievances he filed. (*Id.*) Plaintiff responded, "So you['re] telling me, pretty much, that despite the fact that you yourself diagnosed and recommended for me to be transferred to a medical facility . . ., [you're going to] place my well-being in jeopardy by placing me on the back burner because I filed a grievance concerning my health." (*Id.*) Defendant Lewis responded, "Come on Mr. Vorus, how long have you been doing this? You filed a complaint on my supervisor . . . what did you think was [going to] happen? My hands are even tied now." (*Id.*)

Plaintiff asked Defendant Lewis "what would be the end result of him receiving the treatment as she originally recommended." (*Id.*) Defendant Lewis responded that she was "not sure how things would 'play out' now due to the circumstances that the complaints created, but that he should be hearing something back soon." (*Id.*) She then walked off, and Plaintiff did not see or hear from her again. (*Id.*)

Plaintiff submitted more kites to Defendants Monville and Jeffery; he also mailed another letter to Corizon. (*Id.*) Specifically, Plaintiff complained that he had been diagnosed with neutropenia and that staff failed to adhere to Defendant Lewis' recommendation to transfer him. (*Id.*) A week later, Plaintiff received a response from Defendant Monville, stating that his case "was not urgent." (*Id.*) Defendant Monville told Plaintiff to "continue practicing safety protocols to prevent contracting COVID-19, and to continue taking his 'vitamins' as prescribed." (*Id.*) Plaintiff notes further that he never received a response from Corizon. (*Id.*)

Based on the foregoing, Plaintiff asserts violations of his First and Eighth Amendment rights. (*Id.*, PageID.7–8.) He seeks declaratory relief, as well as compensatory and punitive damages. (*Id.*, PageID.8.)

## II.     Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr.*

*Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). As noted above, Plaintiff contends that Defendants violated his Eighth Amendment rights, and that Defendant Lewis violated his First Amendment rights by retaliating against him.

### A.    Claims Against Defendant Corizon

As noted above, Plaintiff has sued Corizon, the medical provider for the MDOC. A private entity which contracts with the state to perform a traditional state function like providing healthcare to inmates—like Corizon—can "be sued under § 1983 as one acting 'under color of state law.'" *Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993) (quoting *West v. Atkins*, 487 U.S. 42, 54 (1988)). The requirements for a valid § 1983 claim against a municipality apply equally to private corporations that are deemed state actors for purposes of § 1983. *See Starcher v. Corr. Med. Sys., Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001) (recognizing that the holding in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), has been extended to private corporations); *Street*, 102 F.3d at 817–18 (same); *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 409 (2d Cir. 1990) (same); *Cox v. Jackson*, 579 F. Supp. 2d 831, 851–52 (E.D. Mich. 2008) (same).

"Under 42 U.S.C. § 1983, while a municipality can be held liable for a constitutional violation, there is no vicarious liability based on the acts of its employees alone." *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020) (citing *Monell*, 436 U.S. at 690–91). Instead, a municipality "can be sued under § 1983 only when a policy or custom of that government caused the injury in question." *Id.* (citations omitted). "[T]he finding of a custom or policy is the initial determination to be made in any municipal liability claim." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). Further, the policy or custom must be the moving force behind the constitutional injury, and a plaintiff must identify the policy, connect the policy to the governmental entity, and

show that the particular injury was incurred because of the execution of that policy. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005) (citing *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003)); *Claiborne Cnty.*, 103 F.3d at 508–09.

A "policy" includes a "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the governmental body's officers. *Monell*, 436 U.S. at 690. A "custom" is a practice "that has not been formally approved by an appropriate decision maker," but is "so widespread as to have the force of law." *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (citations omitted). Consequently, because the requirements for a valid § 1983 claim against a municipality apply equally to Corizon, Corizon's, like a governmental entity's liability, "must also be premised on some policy [or custom] that caused a deprivation of [a prisoner's] Eighth Amendment rights." *Starcher*, 7 F. App'x at 465. Additionally, Corizon's liability in a § 1983 action cannot be based on a theory of respondeat superior or vicarious liability. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citation omitted).

Here, Plaintiff contends that Corizon failed "to intervene and curb the reported violations alleged in this complaint after receiving notice of the flagrant conditions Plaintiff suffered." (ECF No. 1, PageID.7.) Plaintiff's complaint, however, is devoid of any facts suggesting that a Corizon policy or custom caused a deprivation of his Eighth Amendment rights. Rather, it appears that Plaintiff seeks to hold Corizon liable on a theory of respondeat superior. Where a plaintiff fails to allege that a policy or custom existed, dismissal of the action is appropriate. *See Rayford v. City of Toledo*, No. 86-3260, 1987 WL 36283, at *1 (6th Cir. Feb. 2, 1987); *see also Bilder v. City of Akron*, No. 92-4310, 1993 WL 394595, at *2 (6th Cir. Oct. 6, 1993) (affirming dismissal of § 1983 action when plaintiff's allegation of a policy or custom was conclusory, and plaintiff failed to

allege facts tending to support the allegation). Because Plaintiff fails to state a § 1983 claim against Corizon, the Court will dismiss Corizon as a Defendant.

### B.    First Amendment Retaliation Claim

Plaintiff contends that Defendant Lewis retaliated against him by denying him medical treatment in the form of her recommended transfer after he filed a grievance against her. (ECF No. 1, PageID.7.) Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The filing of a nonfrivolous prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). Plaintiff, therefore, has adequately alleged that he engaged in protected conduct by stating that he filed grievances concerning his medical care against Defendant Lewis and others at AMF.

To establish the second element of a retaliation claim, a prisoner-plaintiff must show adverse action by a prison official sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *Thaddeus-X*, 175 F.3d at 396. The adverseness inquiry is an objective one and does not depend on how a particular plaintiff reacted. The relevant question is whether the defendants' conduct is "*capable* of deterring a person of ordinary firmness"; the plaintiff need not

show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (emphasis in original). Here, Plaintiff contends that Defendant Lewis essentially rescinded her own recommendation that he be transferred to a safer COVID-19 cohort facility after being diagnosed with neutropenia. Plaintiff, therefore, has adequately alleged adverse action for the purpose of his retaliation claim.

Finally, to state a First Amendment retaliation claim, Plaintiff must allege facts that support an inference that the protected conduct motivated the adverse action. Here, Plaintiff explicitly alleges that the adverse action was linked to the protected conduct temporally and that Defendant Lewis indicated to him that her action was taken in response to his grievances. Plaintiff, therefore, has adequately alleged a First Amendment retaliation claim against Defendant Lewis.

### C.    Eighth Amendment Claims

Plaintiff faults Defendant Lewis for violating his Eighth Amendment rights by not providing adequate medical treatment and for failing to ensure that he was "free from a contagious environment." (ECF No. 1, PageID.7.) Plaintiff also faults Defendants Monville and Jeffery for violating his Eighth Amendment rights by not taking action to ensure that Plaintiff was quarantined prior to testing positive for COVID-19 and, subsequently, for not taking action to transfer Plaintiff upon the recommendation of Defendant Lewis. (*Id.*, PageID.8.) Essentially, Plaintiff contends that Defendants' failure to follow MDOC protocols regarding quarantine led to him contracting COVID-19, which in turn led him to suffer from neutropenia. Plaintiff also avers that Defendants failed to provide adequate treatment in the form of a recommended transfer to a COVID-19 cohort facility.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and

wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually knew of a substantial

risk to inmate health or safety may be found free from liability if they responded reasonably to the

risk, even if the harm ultimately was not averted." *Id.* at 844.

        1.       **Claims Regarding Failure to Follow COVID-19 Protocols**

        a.       **Objective Prong**

In a 2020 case brought by federal prisoners under 28 U.S.C. § 2241, the Sixth Circuit

addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights

of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to

adequately protect them from COVID-19 infection. *Wilson v. Williams*, 961 F.3d 829 (6th Cir.

2020). In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the

objective component of an Eighth Amendment claim:

> The COVID-19 virus creates a substantial risk of serious harm leading to
> pneumonia, respiratory failure, or death.  The BOP acknowledges that "[t]he health
> risks posed by COVID-19 are significant." CA6 R. 35, Appellant Br., PageID 42.
> The infection and fatality rates at Elkton have borne out the serious risk of COVID-
> 19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in
> conjunction with Elkton's dormitory-style housing—which places inmates within
> feet of each other—and the medically-vulnerable subclass's health risks, presents a
> substantial risk that petitioners at Elkton will be infected with COVID-19 and have
> serious health effects as a result, including, and up to, death. Petitioners have put
> forth sufficient evidence that they are "incarcerated under conditions posing a
> substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

The Sixth Circuit, however, issued *Wilson* in the first few months of the COVID-19

pandemic, and much changed between June 2020 and December 2021. By early 2021, the FDA

authorized for emergency use three different COVID-19 vaccines. *See Does v. Mills*, 595 U.S. —

—, 142 S. Ct. 17, 21, 211 L.Ed.2d 243 (2021) (Gorsuch, J., dissenting) (dissenting from the denial

of an application for injunctive relief and noting that the COVID-19 situation had changed between

2020 and late 2021). During 2021, MDOC gave prisoners an opportunity to get vaccinated, and

many prisoners seized the opportunity. By January 7, 2022, 68% of MDOC prisoners were fully

vaccinated. *See* Emergency Order Under MCL 333.2253-Requirements for Prisons (Jan. 13, 2022), https://www.michigan.gov/documents/coronavirus/MDHHS_Prison_Requirements_Order _Jan._ 13_2022_-_FINAL_745729_7.pdf. The FDA has further approved or authorized treatments for those who fall ill with COVID-19. *See* FDA, *Know Your Treatment Options for COVID-19* (Jan. 27, 2022), https://www.fda.gov/consumers/consumer-updates/know-your-treatment-options-covid-19. Put simply, COVID-19 did not pose the same risk to prisoners in late 2021 that it did 18 months earlier in the summer of 2020 when the Sixth Circuit issued *Wilson*.

Nonetheless, at this stage of the proceedings, the Court will adhere to the standard set forth by the Sixth Circuit in *Wilson*, which provides that a medically vulnerable inmate may satisfy the objective prong by alleging conditions that could facilitate COVID-19 transmission within a prison and the health risks posed by the virus. Here, Plaintiff alleges conditions that facilitated COVID-19 transmission within AMF—the failure to quarantine COVID-positive prisoners from those who tested negative. Plaintiff also suggests that he was medically vulnerable because: (1) he suffered medically when he contracted COVID-19 in 2020; (2) he contracted COVID-19; and (3) this time, the virus caused a rare reaction that caused a decrease in white blood cells, leading Plaintiff to be diagnosed with neutropenia. The Court, therefore, concludes that at this stage of the proceedings, Plaintiff alleges facts sufficient to satisfy the objective prong of the deliberate indifference test.

### b. Subjective Prong

The Sixth Circuit went on in *Wilson* to address the subjective prong of an Eighth Amendment claim, noting that the pertinent question was whether the BOP's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison.

> There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v.*

*Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.

The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br., PageID 42. These actions include

> implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.

*Id.* at 42–43.

The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment. We agree.

Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights. *Farmer*, 511 U.S. at 844. The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks. The BOP initially struggled to scale up its testing capacity just before the district court issued the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing. The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Id.* at 840–41.

In its decision, the Sixth Circuit recognized that other Sixth Circuit decisions have found similar responses by prison officials and medical personnel, such as cleaning cells, quarantining

infected inmates, and distributing information about a disease in an effort to prevent spread, to be reasonable. *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v. Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018)). The *Wilson* Court also noted that other circuits had concluded that similar actions by prison officials demonstrated a reasonable response to the risk posed by COVID-19:

> In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims. 958 F.3d [1081,] 1085 [(11th Cir. 2020) (per curiam)]. The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC") is] taking the risk of COVID-19 seriously." *Id.* at 1088–90 (citation omitted). In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085–86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id.* at 1090.
>
> Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier,* 956 F.3d 797 (5th Cir. 2020) (per curiam),] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)]. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 802–03. In *Marlowe*, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional

14

center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient. 2020 WL 2043425, at *2–3.

*Wilson*, 961 F.3d at 841–42.

After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions, not only to treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19. The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843–44.

In addition, in *Cameron v. Bouchard,* 818 F. App'x 393 (6th Cir. 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims. The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19 at the jail. The district court initially granted a preliminary injunction requiring the defendants to "(1) provide all [j]ail inmates with access to certain protective measures and medical care intended to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and Plaintiffs' counsel with a list of medically vulnerable inmates within three business days." *Id.* at 394. However, following the decision in *Wilson*, the Court granted the defendants' renewed emergency motion to stay the preliminary injunction, finding that the preventative measures taken by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable response to the threat posed by COVID-19 to the plaintiffs. *Id.* at 395. Subsequently, in an unpublished opinion issued on July 9, 2020, the Sixth Circuit vacated the injunction. *Cameron v. Bouchard*, 815 F. App'x 978 (6th Cir. 2020).

Here, Plaintiff contends that Defendants Lewis, Monville, and Jeffery failed to enforce MDOC COVID-19 protocols by failing to quarantine those inmates who had tested positive. Although Plaintiff does not reference them by name, it appears that Plaintiff is referring to the MDOC's COVID-19 Director's Office Memoranda (DOMs). The MDOC issued its first COVID-19 DOM on April 8, 2020. *See* MDOC DOM 2020-30 (eff. Apr. 8, 2020) (mandating multiple protective measures including the wearing of masks by prisoners and staff, screening of all individuals before entering prison facilities, keeping of social distance, restricting visits and phone calls, and limiting transfers and cell moves). The MDOC issued eight revised DOMs during the remainder of 2020, and 12 more revised DOMs in 2021 before the start of the allegations in the complaint.

The DOMs set forth specific details about protective measures to be taken in all MDOC facilities: describing the types of personal protective equipment (PPE) to be worn by staff and when; setting screening criteria for individuals entering facilities; setting social distancing requirements; establishing isolation areas and practices for isolation; setting practices for managing prisoners under investigation for COVID-19; modifying how personal property is managed; setting requirements for jail transfers; outlining communication adjustments and video visitation; upgrading hygiene, health care, and food service policies; setting protocols for COVID-19 testing of prisoners; and making other necessary adjustments to practices to manage the pandemic.

Here, however, Plaintiff explicitly alleges that Defendants Lewis, Monville, and Jeffery failed to comply with the DOMs protocols for isolating and quarantining inmates who had tested positive for COVID-19 from those who had tested negative. He also contends that they failed to effectuate his transfer to a COVID-19 cohort facility after he contracted the virus and was

diagnosed with neutropenia after experiencing an excessive drop in white blood cells. While Plaintiff has in no way proven deliberate indifference, at this stage of proceedings, Plaintiff has put forth sufficient allegations that Defendants Lewis, Monville, and Jeffery knew of and disregarded an excessive risk to inmate health or safety. *See* Order, *Brooks v. Washington*, No. 21-2639 (6th Cir. Mar. 30, 2022) (ECF No. 12) (concluding that inmate-plaintiff had set forth sufficient allegations regarding Eighth Amendment claims that defendants had failed to comply with MDOC COVID-19 protocols and remanding for further consideration of plaintiff's claims). Plaintiff, therefore, has stated plausible Eighth Amendment claims against Defendants Lewis, Monville, and Jeffery regarding the failure to comply with MDOC COVID-19 protocols regarding quarantine and protocols regarding transfer of medically vulnerable inmates to cohort facilities.

### 2.      Claims Regarding Medical Care

Plaintiff also suggests that Defendants Lewis, Monville, and Jeffery failed to provide adequate medical care after he was diagnosed with COVID-19 and neutropenia. Specifically, Plaintiff avers that Defendant Lewis initially recommended that he be transferred to a COVID-19 medical cohort facility, but that this recommendation was never carried out. He also suggests that either Defendant Monville or Defendant Jeffery, by way of their supervisory positions in the medical department, had the authority to effectuate such transfers.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

Deliberate indifference may be manifested by a doctor's failure to respond to the medical needs of a prisoner, or by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 104–05.

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 539–40 (6th Cir. 2008). Obviousness, however, is not strictly limited to what is detectable to the eye. Even if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear. *See, e.g., Rouster v. Saginaw Cnty.*, 749 F.3d 437, 446–51 (6th Cir. 2014) (holding that a prisoner who died from a perforated duodenum exhibited an "objectively serious need for medical treatment," even though his symptoms appeared to the medical staff at the time to be consistent with alcohol withdrawal); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff

18

must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer,* 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. To prove a defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence . . . : A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842)).

However, not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105–06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017); *Briggs v.*

*Westcomb*, 801 F. App'x 956, 959 (6th Cir. 2020); *Mitchell v. Hininger*, 553 F. App'x 602, 605 (2014). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

Here, Plaintiff contends that Defendants Lewis, Monville, and Jeffery refused to provide medical treatment, including the recommended transfer, for his symptoms while he was suffering from COVID-19 and neutropenia. Given Plaintiff's allegations, he has set forth plausible Eighth Amendment claims concerning inadequate medical care against Defendants Lewis, Monville, and Jeffery at this time.

## <u>Conclusion</u>

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendant Corizon will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). Plaintiff's First Amendment retaliation claim against Defendant Lewis, as well as his Eighth Amendment claims against Defendants Lewis, Monville, and Jeffery, remain in the case.

An order consistent with this opinion will be entered.


Dated:   ___July 26, 2022___          ___/s/ Robert J. Jonker___
                                      Robert J. Jonker
                                      United States District Judge

20